IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES WALSH, et al., | : | |
| Plaintiffs, | : | CIVIL ACTION |
| | : | No. 21-4464 |
| v. | : | |
| | : | |
| NATIONWIDE MUTUAL FIRE | : | |
| INSURANCE COMPANY, | : | |
| Defendant. | : | |

**MEMORANDUM**

**Schiller, J.**                                                                                       **November 21, 2022**

Plaintiffs James and Carolyn Walsh sued Defendant Nationwide Mutual Fire Insurance Company claiming it breached its obligation to provide coverage for damage to their roof and personal property after a storm. Nationwide moves for partial summary judgment, arguing the Walshes' insurance policy does not provide coverage for their personal property damage claim. For the reasons that follow, the Court denies Nationwide's motion.

**I.      BACKGROUND**

**A.      Nationwide Denies Full Coverage and the Walshes File Suit**

Nationwide issued the Walshes a homeowner's insurance policy for 8 Christopher Drive, Philadelphia, Pennsylvania (policy number 5837HO655407 (the "Policy")). (Def.'s Ex. B., ECF 10-6.) A significant severe thunderstorm and flash flooding event on July 6, 2020 damaged heir dwelling, personal property, and roof. (*See* Def.'s Ex. D., ECF 10-8, at 13.) As a result, they submitted claim number 730714-GK to Nationwide.

On May 13, 2021, Nationwide informed the Walshes it had determined only "a portion" of their claim was covered under the Policy. (Def.'s Ex. G, ECF 10-11, at ECF p. 2.) According to Nationwide, the Policy covered "the direct damages sustained to the dwelling as a result of the

loss" but not "the personal property loss" because Nationwide's "investigation determined that a covered peril ha[d] not occurred as required in the policy." (*Id.*) More specifically, Nationwide wrote that its "review showed that water entered the interior of the dwelling as a result of water which backed up on the flat roof surfaces due to roof drains clogged with debris and entered through areas which were in poor condition due to wear and tear, deterioration, and lack of maintenance." (*Id.* at ECF p. 6.) It found "no indications of any *direct* damage to the roof or exterior of the dwelling as a result of wind." (*Id.* (emphasis added))

After Nationwide's coverage determination, the Walshes filed this breach of contract action against it for its failure to cover an alleged $147,600 in damage and loss to their personal property and "over $34,000" for the cost to replace the roof.[1] (Compl., ECF 1, ¶ 6.) Nationwide now moves for partial summary judgment on the Walshes' personal property damage claim, arguing they have not met their burden to prove that the damage "was caused by a covered enumerated peril under the insurance Policy." (Def.'s Br., ECF 10-2, at 2.)

**B.   The Policy**

Coverage C of the Policy provides that Nationwide "cover[s] personal property owned or used by an insured at the residence premises." (Def.'s Ex. B at ECF p. 11.) Relevant here, it covers "accidental direct physical loss to property described in Coverage C caused by the *following perils* except for losses excluded under Section I – Property exclusions." (*Id.* at ECF p. 17 (emphasis

---

[1]   The parties submitted the Walshes' claim pertaining to the dwelling (excluding the roof and personal property) to appraisal and the amount of loss for the dwelling was determined to be $363,950.32, less $102,961.74 in depreciation – a total of $260,988.58. (Pls.' Ex. A, ECF 11-1, ECF p. 3.) According to the Walshes, Nationwide paid it the amount awarded by the appraisers and paid $16,800 for the services of two remediation companies. (Pls.' Resp. to Def.'s Stmt. Of Undisputed Facts, ECF 11, at ECF p. 3-4, ¶ 2.) Nationwide represents that it has paid the Walshes $276,846.31 for the dwelling portion of their claim. (Def.'s Br., ECF 10-2, at 1, n.1.)

added).) The "following perils" include "[w]indstorm or hail" and "[f]alling objects." Specifically, under the windstorm or hail peril, the Policy covers "[d]irect loss caused by rain . . . driven through roof or wall openings made by *direct action* of wind, hail or other insured peril . . . ." (*Id.*, ¶ 2 (emphasis added).) With respect to "falling objects," the Policy does *not* cover loss to "property in a building, *unless* the roof or an exterior wall of the building is *first damaged by a falling object*." (*Id.* ¶ 10(a) (emphasis added).) The Policy does not define "falling," "objects," or "falling objects."

C. **Claimed Storm Damage**

On the day of the storm, Christian Trotter, a roofer and general contractor, visited the Walshes to inspect the flat roof over the rear of their home. (Pls.' Ex. B, ECF 11-1 at ECF p. 5.) He observed that "the wind had blown a great deal of tree debris onto [their] roof[,] including branches and leaves which blocked the roof drains[,] allowing the rain water to pool on the roof at the drain areas to a height of approximately 12" inches [sic] . . . ." (*Id.* at ECF p. 10.) In his opinion, damage to the home was "the direct result of wind during the torrential storm" and windblown debris "directly caus[ed] damage and openings in the drain seals, roof openings in the counterflashing along roof walls and at seams[,] allowing rain water to flow through these openings to the inside of [the] home." (*Id.*) Trotter removed drain-blocking debris, allowing remaining standing water "to be discharged from the roof." (*Id.*)

On August 3, 2020, Nationwide's inspector Johnathon Parsons of Ladder Now inspected the Property and found "[n]o wind or hail damage" to the roof. (Def.'s Ex. E, ECF 10-9 at 3.) He also found no tree damage, storm related or otherwise, "on any slope." (*Id.*) His report does note damage "to the roof accessories," including three of eight "Turbine 12" Aluminum" ventilation accessories. (*Id.* at 3-4.)

The Walshes retained a forensic engineering consultant, William H. Green III, P.E., to "inspect the premises" at 8 Christopher Drive "and determine the cause of the water damage to the interior of the home." (Def.'s Ex. D, ECF 10-8, at 4.) Based on the Walshes' and contractor's observations that "[six inches] of rain fell on" the day of the storm, Green opined that "there was a huge deadload on the flat roof for an hour" which, "alone would have contributed to stresses on the roof membrane seams[,] some of which were found open on the side walls and . . . on the flat roof[,] allowing water to enter where the water level was high." (*Id.* at 7.) In his June 30, 2022 report, Green wrote that Jim Walsh "could not prevent debris from collecting on the roof on July 6, 2020 because he was not home when the wind deposited limbs, branches and leaves on the roof" and the "tree debris restricted drains could not handle the volume" of water that "accumulated in a flash flood thunderstorm . . . ." (*Id.*). In Green's opinion, "[t]he loss did occur as a result of windblown debris onto the roof which burdened the drains damaging them and the membranes in which they lay. (*Id.* at 8.) He concluded that "[t]he cause of loss is wind that blew tree debris onto this roof well above grade and protected by parapet walls. Flash flood rain could not drain properly because of wind blown debris and the water infiltrated into the home." (*Id.* at 9.) Green explained that:

> [h]igh wind rip[ped] leaves and limbs from high trees and deposited tree debris on the flat roof. The 4 drains were inundated with debris rendering them ineffective to carry away the large volume of water from the flash flood rain. High water on the roof went under the membrane. Water path was over the side wall wrap, and flat portion of the roof through weakened seams from heavy stretch of the membrane and once under the membrane flows through roof openings below the membrane.
>
> The clogging from wind driven debris collecting over the drain pots restricted flow. The depth of water found before clearing the debris covering the drains was 12" above drains consistent with 6" precipitation in an hour.
>
> The water level on the roof caused openings on the roof, at seams, drains seals [sic] and counterflashing which allowed water to get under the membrane at seams along the perimeter of the roof and once water entered under the membrane, it flowed to

4

> the low point at the drain pots where there are also openings in the roof subfloor for water to easily flow to the ceilings below where it dispersed to seams and joints and even to the side walls causing severe damage.

(*Id.* at 8-9.)

Nationwide also retained an engineer to inspect the Property. (Def.'s Ex. F, ECF 10-10.) In an April 21, 2021 report and August 5, 2022 supplemental report, Kevin Fischer, P.E. of National Forensic Consultants opined that rain did not enter the property because wind or hail had caused any openings in the roof. (*Id.*) In his initial report, Fischer explained that "four 2-inch-diameter roof drains all showed perimeter patching with dissimilar materials" and described the "rear roof covering, the finishes and repairs on the parapet walls, the capping on the parapet walls" as "all older and . . . in general poor condition." (*Id.* at ECF p. 5-6.) He wrote that "[t]he scenario of all drains being clogged and a build-up of storm water occurring on this rear roof and then leaking into the house is very plausible." (*Id.* at ECF p. 6.) He also wrote that it was "more than likely that the roof leaked as a result of the generally poor condition of the roof, and the back up of water at the roof drains . . . ." (*Id.*) Fischer opined that there was "no visible wind and/or hail damage to the roof or surrounding areas to cause the leaks that occurred" and any leak "into the house [was] more than likely caused by aged/deteriorated roofing conditions and/or back up of storm water on the roof due to filled/clogged drains and the absence of proper drain covers." (*Id.* at ECF p. 7.) In his opinion, the "back-up of water would have then tested various potential leak areas within the roofing system." (*Id.*) In Fischer's supplemental report, prepared after review of additional documents, he wrote that his "opinions remain unchanged that the water damages [sic] that occurred within the house were caused by the back-up of storm water on the roof, caused by clogged roof drains." (*Id.* at ECF p. 9.) He saw "no visible wind or storm damages to any parts of the house or roofing system that caused any openings to allow storm water to enter" and in his

opinion, "the only cause that allowed leaks to occur were the leaves and debris that clogged the roof drains." (*Id.* at ECF p. 10.)

## II.     STANDARD OF REVIEW

Summary judgment is proper if the movant proves that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018). A fact is "material" if it may affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine dispute" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A mere scintilla of evidence supporting the nonmoving party, however, will not suffice. *Id.* at 252. Rather, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 256.

At summary judgment, a court may consider any material in the record that may be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387-88 & n.13 (3d Cir. 1999). In doing so, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). Nor may a court make credibility determinations or weigh the evidence. *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016).

## III.    DISCUSSION

A determination of coverage under an insurance policy is a question of law to be decided by the court. *PECO Energy v. Boden*, 64 F.3d 852, 855 (3d Cir.1995). "Ordinarily in insurance coverage disputes an insured bears the initial burden to make a prima facie showing that a claim

falls within the policy's grant of coverage, but if the insured meets that burden, the insurer then bears the burden of demonstrating that a policy exclusion excuses the insurer from providing coverage if the insurer contends that it does." *State Farm Fire & Cas. Co. v. Mehlman*, 589 F.3d 105 (3d Cir. 2009) (citing *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir.1996) (applying Pennsylvania law)). Courts must construe coverage clauses broadly and exclusions strictly. *Westport Ins. Corp. v. Bayer*, 284 F.3d 489, 498 n.7 (3d Cir. 2002) (citing *Eichelberger v. Warner*, 434 A.2d 747, 750 (Pa. Super. Ct. 1981)). The Court's primary aim is "to ascertain the intent of the parties as manifested by the language of the written instrument." *Standard Venetian Blind Co. v. Am. Empire Ins. Co.*, 469 A.2d 563, 566 (Pa. 1983) (citation omitted).

To determine the meaning of an insurance policy provision, the Court must read the policy as a whole and construe its meaning according to its plain language. *Meyer v. CUNA Mut. Ins. Soc.*, 648 F.3d 154, 163 (3d Cir. 2011) (citations omitted). If the insurance contract's language is unambiguous, the Court will simply apply it; if, however, a provision of the contract is ambiguous, it is construed against the insurer, the drafter of the agreement. *Regents of Mercersburg Coll. v. Republic Franklin Ins. Co.*, 458 F.3d 159, 172 (3d Cir.2006) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986)).

A.   **Windstorm or Hail Peril**

Personal property coverage under the Policy is provided on a "named peril" basis. It provides coverage for sudden direct physical loss to personal property only if the loss is covered by a specific enumerated peril. Nationwide contends the only named peril which is possibly applicable to the Walshes' claim is the "windstorm or hail" peril. (Def.'s Br., ECF 10-2, at 8.) Under that provision, the Walshes have the initial burden of proving they suffered a "[d]irect loss caused by rain . . . driven through roof or wall openings made by direct action of wind, hail or

other insured peril . . . ." (Def.'s Ex. B at ECF p. 17, ¶ 2.) Nationwide argues the Walshes' loss was caused by tree debris clogging roof drains, which "is not a direct action of wind causing the openings in the roof." (Def.'s Br., ECF 10-2, at 8.)

The court in *Weinberg v. Nationwidecasualty & Insurance Co.* was not convinced an identical windstorm or hail provision provided coverage where the plaintiff testified that he "did not see any path of penetration for the water to come in" to his home. 949 F. Supp. 2d 588, 593 (E.D. Pa. 2013). Instead, the plaintiff's evidence "suggest[ed] that the water infiltration was not driven through roof or wall openings made by direct action of wind, hail, or other insured peril," as the policy required for coverage. *Id.* (internal quotation omitted). Similarly, in *Smith v. Westfield Insurance Co.*, the court held that any interior loss caused by mold or wet rot was excluded under a policy's "windstorm or hail peril," because it was not the "direct result" of a windstorm or hail. No. 06-3077, 2007 WL 1740816, at *3 (E.D. Pa. June 15, 2007). The policy there stated that the "windstorm or hail" peril did "not include loss to the property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening." *Id.*

Upon review of the summary judgment record, the Policy's windstorm and hail peril does not require Nationwide to cover damage to the Walshes' personal property because they have not shown rain entered their dwelling through openings that were "made by direct action of wind . . . ." (*See* Def.'s Ex. B at ECF p. 17, ¶ 2.) There is no evidence that the storm caused any debris to puncture the roof or roof membranes. Instead, water entered the property after tree debris accumulated and clogged their roof drains. As Trotter explained, tree debris "blocked the roof drains" and the blockage allowed "rain water to pool on the roof . . . ." (Pls.' Ex. B, ECF 11-1 at

ECF p. 5.) Only then did the seams in the roof open, allowing rain to enter inside the house. Wind did not immediately—i.e., directly—cause the loss to the Walshes' personal property. Likewise, Green opined that the six inches of rain that fell on the day of the storm created "a huge deadload on the flat roof for an hour" which, "alone would have contributed to stresses on the roof membrane seams[,] . . . allowing water to enter where the water level was high." (Def.'s Ex. D, ECF 10-8, at 7.) He explained that "[t]he water level on the roof caused openings on the roof, at seams, drains seals [sic] and counterflashing which allowed water to get under the membrane at seams along the perimeter of the roof . . . ." (*Id.* at 9.)

The Walshes have not set forth enough evidence to permit a reasonable factfinder to conclude that the openings in the roof were created by the direct action of wind. However, the Court's analysis does not end with this peril.

### B.     Falling Objects Peril

The Walshes also contend Nationwide breached its obligation to provide coverage for personal property damage pursuant to the Policy's "falling objects" peril, which provides coverage when "the roof or an exterior wall of the building is first damaged by a falling object." (Pl.'s Mem., ECF 11 at ECF p. 26-30; Def.'s Ex. B at ECF p. 17, ¶ 10(a).) Nationwide's Motion does not address the implications of the falling objects peril and it filed no reply to the Walshes' response to its Motion. As the Walshes point out, Nationwide's coverage denial letter appears to have "overlooked the peril of falling objects," because, although the letter lists the peril, it does not address it when explaining the coverage denial. (*Id.* at ECF p. 29-30.) Nationwide only explained it was denying coverage because "[t]here were no indications of any direct damage to the roof or exterior of the dwelling as a result of wind." (*Id.* at 30.)

The Walshes argue that the "common sense meanings" of "the everyday terms of falling and objects and falling objects" lead to the reasonable conclusion that tree limbs, tree debris, and rain fell on their roof and constitute "falling objects which damaged" their roof. (Pl.'s Mem., ECF 11, at ECF p. 28.) They contend this peril does not "require that the falling object(s) cause an opening or any other particular type of damage" and maintain that a factfinder could reasonably find that [their] personal property is covered because of damage to their roof caused by falling objects whether those objects are tree limbs, tree debris, or rain drops . . . ." (*Id.* at ECF p. 29.) Nationwide offers no argument in response.

The Walshes have set forth enough evidence to make a prima facie showing that their claim falls within the Policy's grant of coverage under the falling objects peril. Trotter explained that windblown debris "directly caus[ed] damage and openings in the drain seals, roof openings in the counterflashing along roof walls and at seams[,] allowing rain water to flow through these openings to the inside of [the] home." (Pls.' Ex. B, at ECF p. 10.) Green explained that "[h]igh wind rip[ped] leaves and limbs from high trees and deposited tree debris on the flat roof" and attributed the Walshes' loss to "windblown debris" on the roof "which burdened the drains damaging them and the membranes in which they lay." (Def.'s Ex. D at 8.) Indeed, Nationwide's own expert Fischer believed "[t]he scenario of all drains being clogged and a build-up of storm water occurring on this rear roof and then leaking into the house is very plausible." (Def.'s Ex. F at ECF p. 6.) In his opinion, "the leaves and debris that clogged the roof drains" were "the only cause that allowed leaks to occur . . . ." (*Id.* at ECF p. 10.) Nationwide offers nothing to counter the evidence that falling tree debris damaged the seams on the Walshes' flat roof. It is not entitled to partial summary judgment with respect to the Walshes' claim for breach of contract as to their

10

personal property damage claim because it has not met its burden to demonstrate that it is excused from providing coverage under the falling objects peril.

An Order consistent with this Memorandum will be docketed separately.